VIRGINIA RAILWAY & POWER CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

NORTHSIDE VIADUCT CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

CITY GAS COMPANY OF NORFOLK, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 9040, 11731, 11728, 14200, 11730, 14199.
Promulgated December 2, 1927.

*Bernard R. Youngman, Esq.*, for the petitioners.
*J. Harry Byrne, Esq.*, for the respondent.

472

478

OPINION.

GREEN: Was the Virginia Railway & Power Co. affiliated during the years and periods in question with the Northside Viaduct Co. and the Highland Park Co.? It operated the principal properties of these companies as a part of its integral system of railways. It owned directly 61.23 per cent of the capital stock of the Viaduct Company and 85.18 per cent of the Highland. The minority stockholders of the two latter companies did not vote either directly or through proxies any of their stock during the four years here in question. The Virginia Company voted during this period all the stock it owned in both companies. The officers of the Virginia Company were also the officers of the Viaduct and the Highland. Section 240 of the Revenue Acts of 1918 and 1921 reads in part as follows:

For the purpose of this section two or more domestic corporations shall be deemed to be affiliated (1) if one corporation owns directly or controls through closely affiliated interests or by a nominee or nominees substantially all the

stock of the other or others, or (2) if substantially all the stock of two or more corporations is owned or controlled by the same interests.

In the *Appeal of Hartford & Connecticut Western Railroad Co.*, 2 B. T. A. 211, the stockholdings were as follows:

| Stockholders | H. & C. Co. | New Haven | New England |
|---|---|---|---|
| | *Per cent* | *Per cent* | *Per cent* |
| New Haven | 58 | | 99. 9 |
| Unknown | 41. 1 | 100 | . 1 |
| | 100 | 100 | 100 |

The New England operated the properties of H. & C. Co. by means of a lease. After holding that the New England was a " closely affiliated interest " of the New Haven, we said:

\* \* \* In the present case, however, it is contended that the existence of a substantial minority of outstanding stock should defeat affiliation. It is not shown that by any Act such minority has or could frustrate any purpose or plan of the New Haven, but on the contrary, the insignificant number of minority shares which voted at the stockholders' meetings in 1917 and 1918 indicates an unobstructed control by the New Haven. \* \* \* When one corporation so far controls the property and affairs of the other as to leave in the minority stockholders nothing but a bare interest in a division of the rental, it is quibbling to say that the minority stock is not controlled. We must conclude that the New Haven owned directly or controlled substantially all the stock of the taxpayer, and that they were affiliated within the meaning of the statute.

In the instant case, while the record is not as complete as it might be, we believe that the Virginia Company controlled a sufficient amount of the minority stock in the Viaduct and Highland which when added to the direct holdings of 61.23% and 85.18% brings it within the statute of owning or controlling substantially all the stock. The three companies, in our opinion, are affiliated.

Was the Virginia Railway & Power Co. affiliated during the years and periods in question with the City Gas Company of Norfolk? It owned directly only 19.98% of the capital stock of the Gas Company. The remaining 80.02% was owned by the Norfolk Railway & Light Co. The latter company, however, on April 28, 1906, leased for 99 years all its properties of every description, except its franchise to be a corporation, to the Norfolk & Portsmouth Traction Company which company, by virtue of an agreement of merger and consolidation, dated May 22, 1911, was succeeded by the Virginia Railway & Power Co., the lease in question being assigned to the latter company. Paragraph seven of the lease stated that " \* \* \* all of the railway, light and power properties and plants owned, controlled or operated by the Lessor and Lessee are so connected as

to naturally form one complete system, and it is deemed desirable, and is now proposed, to bring said properties under one management and control  *  *  *." In order to carry out this proposal the lease specifically provided that among the assets to be leased was the 80.02% " of the capital stock of the City Gas Company." Article II provided that " The Lessor will surrender and deliver to the Lessee on the first day of June 1906  *  *  * sole and exclusive possession of all  *  *  * certificates assigned in blank for all shares of the capital stock of any incorporated company." Article X provided that the lessor " will cause proper proxies to be executed and delivered to the Lessee or its appointee, so that any voting power vested in the Lessor as to all and every of said shares of stock subject to this lease, may be exercised by the Lessee, its successors or assigns." The Virginia Company voted all the stock of the City Gas Co. and received all the dividends paid by the City Gas Co. Thos. S. Wheelwright and G. B. Williams were president and secretary-treasurer, respectively, of the two companies. The Virginia Company actually operated the business of the City Gas Co. as a part of its own system. It is, therefore, our opinion that the evidence in this case is convincing as to our conclusion that the Norfolk Railway & Light Co. is the closely affiliated interest through which the Virginia Railway & Power Co. controlled the 80.02% of the stock of the City Gas Company of Norfolk, thereby bringing its control of such stock up to 100 per cent. *Appeal of Huntington & Clearfield Telephone Co.*, 1 B. T. A. 731. Since the Virginia Company owned directly or controlled through closely affiliated interests 100 per cent of the stock of the City Gas Co., the two companies are, in our opinion, affiliated within the meaning of section 240 of the Revenue Acts of 1918 and 1921.

The respondent devoted a considerable part of his brief to the argument that the two companies should be denied affiliation for the reason that there would be a duplication of statutory invested capital to the extent of 80 per cent, if the two companies were ruled affiliated and " that Congress intended such a vicious result should not be lightly imputed to it." We might dismiss such a contention with the statement that the determination of the correct invested capital is not now before us, but even if we were to consider it in connection with the proposition that in construing a statute full consideration must be given to all of its provisions and a construction adopted that will permit all sections to harmonize, we see no merit to such an argument for the reason that the same question would be involved in every case of affiliation under section 240(b)(1) of the 1918 Act where the parent company *owned* less than 100 per cent of the stock of the other or others. It must have been involved in the *Appeals*

of *Hartford & Connecticut Western Railroad Co.*, 2 B. T. A. 211, *L. B. Putney Mercantile Co.*, 3 B. T. A. 836, and *Canyon Lumber Co.*, 4 B. T. A., 940, in which cases this Board allowed affiliation with the parent company only owning 58.9 per cent, 50.2 per cent, and 50 per cent, respectively.

The question of reducing invested capital on account of prior-year income and profits taxes prorated must be decided against the petitioners in accordance with *Appeal of Russel Wheel & Foundry Co.*, 3 B. T. A. 1168.

Reviewed by the Board.

> *Judgment will be entered on 20 days' notice, under Rule 50.*